UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TEXAS CAMPAIGN FOR THE ENVIRONMENT, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-11-791 |
| | § | |
| LOWER COLORADO RIVER AUTHORITY, | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM AND ORDER**

Pending before the court is defendant Lower Colorado River Authority's ("LCRA") motion to dismiss the first amended complaint. Dkt. 18. Intervenor Defendant City of Austin also has filed a motion to dismiss on the same grounds urged by LCRA. Dkt. 28. After review of the motions to dismiss, the responses, the replies, the exhibits, the law, and considering the oral argument presented by the parties, the court finds that plaintiff Texas Campaign for the Environment ("TCE") has standing to assert the claims raised in the amended complaint. The motion to dismiss is, therefore, DENIED in part. However, the motion to dismiss is GRANTED with respect to Counts 1 and 4, and part of Count 2, because those claims are improper collateral attacks on a Title V Operating Permit. The remainder of Count 2 is DISMISSED as having been filed beyond the applicable statute of limitations. Hence, Count 3 is the sole remaining count in this case.

Also before the court is plaintiff's motion for partial summary judgment. Dkt. 31. The portion of the motion addressed to Count 4 is moot since that count has been dismissed. The remainder of the motion, addressed to Count 3 of the amended complaint, is DENIED as premature without prejudice to TCE reasserting its motion at the close of discovery.

## BACKGROUND FACTS

This is a citizen suit filed pursuant to the federal Clean Air Act ("CAA") which permits individuals to bring claims against entities that violate "an emission standard or limitation" imposed under the CAA. 42 U.S.C. § 7604(a)(1). Defendant Lower Colorado River Authority ("LCRA") is a conservation and reclamation district created by the Texas Legislature in 1934. LCRA operates the Fayette Power Project ("FPP"), which has three coal-fired steam electric generating units that are the subject of this lawsuit (hereafter referred to as Unit 1, Unit 2, and Unit 3). The City of Austin co-owns Units 1 and 2, and has intervened in this case.

Plaintiff Texas Campaign for the Environment ("TCE") has filed suit in an organizational capacity on behalf of Maggie Rivers, a TCE member who lives approximately five miles from FPP. Dkt. 14. TCE is a non-profit membership organization dedicated to improving Texans' quality of life and environment. Dkt. 14 ¶ 11. In a declaration attached to the first amended complaint, Ms. Rivers states that she can see smoke coming from the FPP smoke stacks from her property. Dkt. 14-3. Further, she has observed "sooty ash-like deposits" on vehicles on her property, and she is concerned about the effect that emissions from FPP have on her health and on the environment. *Id*. Ms. Rivers was diagnosed with asthma in 2009, which she believes is caused by, or aggravated by, emissions from FPP. *Id*. TCE alleges that Ms. Rivers and other who live near FPP are adversely affected by the "excessive and unlawful emissions of air pollutants from the power plant." Dkt. 14 ¶ 12.

FPP has a decades-long history of regulatory permits, which began as permits addressed to the individual coal-fired boilers, Units 1, 2, and 3. Because the applicable emissions standards and limitations enforceable under the CAA are set forth in construction and operating permits, a brief outline of the applicable permits is necessary to understand the parties' dispute concerning which

emission standards limitations are presently applicable. Unit 1 began operation in 1979, and its construction was authorized by Permit No. 3011. Dkt. 14 ¶¶ 4-5. Unit 2 began operation in 1980, and was constructed pursuant to Permit No. 4629. *Id*. Unit 3 began operation in 1988, and its construction was authorized by Permit No. 9233. *Id*. Permit No. 9233 was consolidated with Permit No. PSD-TX-486M3 and, in 1997, Permit Nos. 3011 and 4629 were consolidated into Permit No. 3010. Dkt. 14-1 ¶ 5. In 2002, the Texas Commission on Environmental Quality ("TCEQ") issued a single, site-wide Flexible Air Permit No. 51770/PSD-TX-486M3 ("Flexible Air Permit") which set forth site-wide emissions standards and limitations, but does not contain any unit-specific limitations. *Id.*; Dkt. 18-3 at 20. The Flexible Air Permit was then incorporated into the 2004 Operating Permit issued on April 2, 2004. Dkt. 18-6. The 2004 Operating Permit references only the Flexible Air Permit as containing applicable requirements "enforceable under this operating permit." *Id*. at 32. The parties dispute both the nature of the standards and limitations applicable to the FPP, and specifically contest whether the Flexible Air Permit is effective to override, replace, or make obsolete the unit specific limitations and standards set forth in prior permits. These arguments and the applicable permits at issue will be discussed in more detail below.

TCE sets forth four causes of action in the first amended complaint, and alleges that LCRA violated the CAA in four particulars:

> 1. LCRA violated and continues to violate heat input limits, which are emission standards or limitations on the power plant's three main coalfired boilers, Units 1, 2, and 3. Boilers have a maximum heat input limit, which is essentially a measure of the boiler's size, or capacity. The greater the maximum hourly heat input capacity, the more coal can be burned. LCRA is bound by its represented maximum hourly heat input limits for each of its three boiler units. These limits are enforceable conditions which have been and continue to be routinely violated. LCRA's heat input limits are enforceable through general conditions of the power plant's currently active and previous air pollution preconstruction permits; the Texas State Implementation Plan, 40 CFR 52.2270(c), 68 Fed. Reg. 64,549 (Nov. 14,

3

>2003); and through Defendant's Title V Federal Operating Permit No. O21. These limits were never voided or made obsolete.
>
>2. LCRA violated and continues to violate the Clean Air Act's Prevention of Significant Deterioration ("PSD") requirements by making major modifications to the power plant's main coal-fired boilers and failing to obtain necessary permits, install best available control technology, reduce emissions, and comply with requirements for monitoring, record-keeping and reporting pursuant to the Clean Air Act's PSD permitting requirements, 42 U.S.C. § 7475, 42 U.S.C. § 7401 et seq.
>
>3. LCRA violated and continues to violate annual particulate matter emission limits contained in the power plant's Flexible Permit No. 51770/PSD-TX-486M3, which is incorporated by reference in the power plant's Title V Federal Operating Permit No. O21. Particulate Matter ("PM") is a mixture of small particles, including organic chemicals, metals, and ash, which can cause health and environmental problems. Fine particles, or "$PM_{10}$" (particulate matter with a diameter of ten micrometers of less), is a health concern because, once inhaled, fine particles can affect the heart and lungs and cause serious health effects. Numerous scientific studies have linked fine particle exposure to increased respiratory symptoms, such as decreased lung function, aggravated asthma, chronic bronchitis, heart attacks, and premature death in people with heart or lung disease. Additionally, PM can be carried long distances to settle over land or water, which may result in pollution of lakes and streams, and damage to farmlands.
>
>4. LCRA violated and continues to violate the Unit 3 hourly particulate matter emission limit of 142.1 lbs/hour contained in in the Fayette power plant's Unit 3 preconstruction permit. This emission limit remains an enforceable operational limit on Unit 3, because it was never voided or made obsolete by any subsequent state permitting action, including the issuance of Flexible Permit No. 9233/PSD-TX-486M3.

Dkt. 14 at 3-4.

LCRA, joined by the City of Austin, moves to dismiss all four counts of the first amended complaint on the basis that TCE lacks standing. Dkts. 18, 28. More specifically, LCRA argues that the alleged harm identified by TCE member Maggie Rivers is not "fairly traceable" to illegal emissions from FPP. Dkt. 18. LCRA also argues that litigation is not "germane" to TCE's purpose as an organization. *Id*. LCRA moves to dismiss Counts 1, 2, and 4 on other bases as well, including

that the citizen claims are improper collateral attacks on the Title V Operating Permit issued for FPP, and that the claims were filed beyond the applicable statute of limitations. *Id.*

TCE has responded to the motions to dismiss, LCRA replied, and other supplemental pleadings have been filed. TCE also moves for partial summary judgment seeking a ruling with respect to Count 4 that the hourly particulate matter emission limit for Unit 3 was not voided or made obsolete by the flexible or site-wide emissions cap approved by TCEQ in 2002. Dkt. 31. TCE also seeks summary judgment with respect to liability for the violation of LCRA's current Operating Permit, i.e., TCE seeks a ruling that LCRA has violated the site-wide emissions cap. LCRA and City of Austin have responded to the motion for partial summary judgment and argue that the first part of the motion will be moot if the court rules in defendants' favor on the pending motions to dismiss, and that there is a material dispute of fact with respect to Count 3, or that a ruling should await further discovery, which has been stayed pending a ruling on the motions to dismiss.

### ANALYSIS

**1.    Standing.**

Article III standing is an "irreducible constitutional minimum." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130 (1992). The plaintiff bears the burden of establishing three things: (1) that she has suffered an actual or threatened injury; (2) the injury is "fairly traceable" to the defendant's actions; and (3) the injury likely will be redressed if TCE prevails in the lawsuit. *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Pet. Corp.*, 207 F.3d 789, 792 (5th Cir. 2000). The Clean Air Act's citizen suit provision authorizes "any person" to "commence a civil action on his own behalf against any person ... who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emissions standard or limitation under this chapter...." 42 U.S.C. § 7604(a). A "person" includes

5

corporations, partnerships and associations. 42 U.S.C. § 7602(e). Nonprofit corporations may invoke the Clean Air Act's citizen suit provision. See, e.g., *Texans United*, 207 F.3d at 792. Thus, if TCE has standing to bring this action under Article III of the Constitution, it also has statutory standing under the Clean Air Act. *Middlesex Cty. Sewerage Auth. v. Nat. Sea Clammers Ass'n*, 453 U.S. 1, 16, 101 S.Ct. 2615 (1981).

TCE alleges that it has standing to pursue a claim on behalf of its member, Maggie Rivers. An organization has standing to bring a suit on behalf of one or more of its members if: (1) its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to its purpose as an association; and (3) neither the claim it asserts, nor the relief it requests, requires the participation of individual members. *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434 (1977); *Texans United*, 207 F.3d at 792. In this case, LCRA and City of Austin dispute whether the first two requirements have been met. It is argued that the alleged pollution is not "fairly traceable" to FPP, thereby defeating Ms. River's standing to sue, and that TCE cannot establish that this litigation is germane to its purpose. Although plaintiff bears the burden of establishing standing, when the standing inquiry arises "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Bennett v. Spear*, 520 U.S. 154, 168, 117 S.Ct. 1154 (1997) (internal quotation marks omitted) (quoting *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130).

  a. *Does Ms. Rivers have a "traceable injury" giving her standing in her own right?*

As noted above, TCE bases its standing on the declaration of Maggie Rivers who can see smoke being emitted from the stacks at FPP, and who has witnessed ash on her property consistent

with that smoke being carried to her yard by prevailing winds. She believes her asthma is either caused by, or is aggravated by, the pollutants emitted by FPP.

LCRA argues that the ash and other pollution Ms. Rivers witnessed could easily be from a source other than FPP, and that if it is from FPP, it may not have been from an *illegal* release, i.e., it may simply be part of the particulate matter the facility legally releases into the atmosphere. In either case, LCRA argues, TCE has failed to identify an injury "fairly traceable" to LCRA's alleged violation of the CAA. LCRA argues that it is not the only source of particulate matter pollution in Fayette County, and offers a comparison to *Texans United* where the court found traceability but did so based upon a much more particularized showing than TCE has made here. More specifically, the plaintiffs in *Texans United* were able to attribute particular odors to the specific facility, the defendants themselves confirmed that the smell could indicate noncompliance with conditions of their permits, and the plaintiffs presented expert witnesses to corroborate their statements concerning the alleged release of pollutants. 207 F.3d at 792-93. LCRA notes that Rivers lives approximately five miles from the facility in this case, and that there is no way to specifically trace the ash on her property, or the alleged particulate matter in the air, to FPP or to a specific violation of an applicable permit.

TCE responds that requiring specificity in tracing an alleged injury to an alleged source of pollution "conflates the issue of standing with the issue of actual liability." *Texans United*, 207 F.3d at 793. And, in any event, standing is being addressed at the pleading stage in this case, and *Texans United* was decided in the context of summary judgment proceedings. Here, in the context of a motion to dismiss, the court accepts as true plaintiff's allegations that LCRA emits particulate matter, that it has exceeded the applicable limitations on particulate matter emissions during the last several years, and that, during that same time period, Ms. Rivers has observed ash deposits on her

property that are consistent with emissions from FPP. The court also accepts Ms. Rivers' assertion that her asthma is at least aggravated by the particulate matter in the air, including that which emanated from FPP. The Fifth Circuit has cited with approval to Ninth Circuit precedent to the effect that "breathing and smelling polluted air is sufficient to demonstrate injury-in-fact and thus confer standing under the CAA." *Id*. at 792. Thus, applying the appropriate pleading standard, TCE has alleged violations of emissions standards applicable to FPP, and has also alleged harm to one of its members consistent with the alleged emissions, which is fairly traceable to FPP.

The court also rejects LCRA's argument concerning other potential sources of pollution in the area. *Texans United* spoke to this issue as well. A CAA plaintiff "must ultimately establish causation if they are to prevail on the merits" but "need not do so to establish standing." 207 F.3d at 793. In fact, in a prior case, the Fifth Circuit has found it sufficient for the "fairly traceable" standard that the alleged "pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs." *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 557 (5th Cir. 1996). Here, that certainly has been alleged, and TCE has alleged sufficient facts to satisfy the "fairly traceable" standard at the pleading stage.

    b.    *Are the interests the litigation seeks to protect germane to TCE's purpose?*

LCRA next asserts that TCE cannot satisfy the "germane" requirement of organizational standing. The germaneness requirement ensures that an association or organization has a sufficient interest in the outcome of litigation to be the defendants' natural adversary. *United Food and Com. Workers Union Loc. 751 v. Brown Group, Inc.*, 517 U.S. 544, 555-56, 116 S.Ct. 1529 (1996) ("*Hunt's* second prong is, at the least, complementary to the first, for its demand that an association plaintiff be organized for a purpose germane to the subject of its member's claim raises an assurance

that the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary.").

Here, LCRA makes a rather unique argument—TCE has *itself* defined its purpose as limited to matters other than litigation. TCE's certificate of formation states:

> This corporation is organized exclusively for the purpose of protecting and preserving the environment *through educational and charitable means* . . .

Dkt. 18-11. LCRA asserts that the court should not condone TCE acting beyond its articles of incorporation, as it has in bringing this case. TCE, hewing to the precise wording of the test from *Hunt*, argues that, regardless of the methodology set forth in TCE's certificate of formation, the "interest it seeks to protect" in this litigation is protection of the environment through enforcement of applicable air quality standards. This interest, TCE asserts, is certainly germane to the purpose of the organization to "protect and preserve the environment." *Hunt*, 432 U.S. at 343 (interests protected in the litigation must be germane to the organization's purpose).

Defendants have not cited, and the court has not located, any case where an organization limited itself to non-litigation means of accomplishing its goals, and that limitation was found to be binding for purposes of the *Hunt* germaneness inquiry. Further, although members of TCE may (or may not) have objections arising from TCE's choice to pursue litigation rather than "education and charitable means" of preserving the environment, as described in *Hunt*, the inquiry is not whether *litigation* is consistent with, or even permitted by, an association's founding documents. The specific inquiry is whether "the *interests it seeks to protect* are germane to its purpose as an association . . . ." 432 U.S. at 343 (emphasis added). Here, litigation is not the interest protected—the environment is the interest protected. That interest is certainly germane to TCE's

purpose, even if it is arguably inconsistent with the *methods* TCE has represented it will use to pursue its goal.

And, in any event, TCE certainly has a stake in the outcome of this litigation arising from its expressed interest in protecting and preserving the environment such that its lawyers will serve as "defendant's natural adversar[ies]." Indeed, LCRA made no argument that TCE attorneys lack the necessary motivation to serve as LCRA's adversary. In short, LCRA has hypothesized that TCE members may have a complaint because TCE is pursuing litigation instead of limiting itself to educational and charitable means of protecting and preserving the environment, but this potential complaint by TCE members is simply not probative on the issue of TCE's "stake" in this litigation. The court finds that the interests TCE seeks to protect in this litigation are germane to its purpose. The court finds that TCE has standing and LCRA's motion to dismiss for lack of standing is DENIED.

**2.    Collateral attack on Title V operating permit.**

LCRA also asserts that all of Counts 1 and 4, and that portion of Count 2 asserting violations of "heat input" limitations, are attempts by TCE to "read into" the Title V permit limitations that were not included in the operating permit because they had been rendered obsolete by the 2002 Flexible Air Permit. LCRA argues that TCE was required to make any argument about the inclusion of such limitations during the Title V administrative permitting process in 2004 and again in 2009 when LCRA was issued operating permits for FPP. LCRA cites to *United Steel Workers of America v. Oregon Steel Mills, Inc.*, 322 F.3d 1222, 1225 (10th Cir. 2003), where the court refused to consider arguments concerning applicable emissions standards because the claims were "cleverly packaged" as claims seeking to *enforce* emissions standards, but were, in fact, challenges to the *adequacy* of the emissions standards actually contained in a Title V operating permit. The former

10

is what a citizen's suit under the CAA permits, but the latter is an argument that should have been made during the public comment and approval processes prior to the permit issuing. This is, in LCRA's view, a "use or use it" opportunity to raise concerns about the emissions standards at a facility that cannot be relitigated (or litigated for the first time) in the context of a CAA enforcement action or citizen suit.

In counts 1 and 4 of the amended petition, TCE alleges that defendants have violated emissions standards contained in *prior* construction permits. Specifically, Count 1 contains allegations that "heat input" limits for Units 1, 2, and 3, which were set forth in construction permits issued between 1979 and 1997, were violated between 2006 and 2009. Dkt. 14 ¶¶ 5, 6, 30-36. Notably, the amended complaint also contains an allegation that these heat input limits "could not have been voided or made obsolete by the issuance, in 2002, of an non-SIP-approved Flexible Air Permit." Dkt. 14 ¶ 34. The 2002 Flexible Permit No. 51770/PSD-TX-486-M3 does *not* contain the heat input limitations referenced by TCE. Count 4 is premised upon an hourly particulate matter limitation made applicable to Unit 3 only in Permit No. 9233 issued in 1983. Again, this permit was consolidated into the 2002 Flexible Air Permit No. 51770/PSD-TX-486-M3, which, once again, does not contain any particulate matter limitation applicable to Unit 3 only. The only emissions standards set forth in the Flexible Air Permit are made applicable to "all sources of air contaminants on the applicant's property covered by this permit" and "are the maximum rates allowed for this facility." Dkt. 18-3 at 20 (2003 alteration of Flexible Air Permit). TCEQ altered the Flexible Air Permit in 2003 and expressly agreed with LCRA that it "contains a flexible cap that covers all equipment and hourly and annual emissions for the entire facility making Permit Numbers 3010 and 9233 obsolete." Dkt. 18-3 at 2.

Also, LCRA's 2004 Operating Permit contains a chart listing prior permits that contain applicable emissions limitations. The only prior permit referenced is the Flexible Air Permit No. 51770/PSD-486-M3. Dkt. 18-7 at 32. Prior permits 3010 and 9233 are not listed. Dkt. 18-7 at 32. Thus, the only emissions requirements specifically referenced in the 2004 Operating Permit are the site-wide limitations set forth in the 2002 Flexible Air Permit.

TCE, however, alleges that the heat input limits and the Unit 3-specific hourly particulate matter emissions limitation are each "enforceable" through the 2004 (and later 2009) Title V Operating Permits issued to LCRA. Dkt. 14 ¶¶ 36, 56. TCE concedes that these limitations do not appear in either the 2004 or 2009 Operating Permits, but instead argues that the limits are "still in effect" and that they could not have been properly voided or modified by the state agency in the Flexible Air Permit issued in 2002. Dkt. 14 ¶ 34 ("emissions limits are federally-enforceable and could not have been voided or made obsolete by the issuance, in 2002, of a non-SIP-approved Flexible Air Permit.").

Thus, at first blush, this dispute requires the court to determine whether the 2002 Flexible Air Permit had the effect that TCEQ and LCRA believed it had—establishing a single, site-wide emissions standard, voiding all prior permit provisions. However, what the court must first determine is its subject matter jurisdiction over that dispute. And, in this instance, the relevant inquiry focuses upon TCE's failure to raise its challenge to the terms and effect of the Flexible Air Permit during the administrative review process leading to the issuance of the 2004 Operating Permit.

The statutory scheme for administrative review of EPA actions, and the bar on CAA citizen suits for claims that could have been raised as objections during the Title V permitting process, was recently explained in *Sierra Club v. Otter Tail Power Co.*:

> We begin our analysis by examining the interplay between 42 U.S.C. §§ 7661d and 7607. Section 7661d establishes a comprehensive scheme for EPA review of proposed Title V permits. See *Romoland [School Dist. v. Inland Empire Energy Center, LLC*, 548 F.3d [738] at 742–43 [(9th Cir. 2008)]. It requires state permitting authorities to submit permit applications and proposed permits to EPA for review. § 7661 d(a)(1). "If any permit contains provisions that are determined by the Administrator as not in compliance with the applicable requirements . . . the Administrator shall . . . object to its issuance" within 45 days. § 7661d(b)(1). If the Administrator does object, the permit may not be issued unless it is revised to meet the objections. §§ 7661d(b)(3), (c). If EPA does not object to a proposed permit, "any person may petition the Administrator within 60 days after the expiration of the 45–day review period . . . to take such action." § 7661d(b)(2). The Administrator must then grant or deny the petition within 60 days. *Id*. "Any denial of such petition shall be subject to judicial review under" 42 U.S.C. § 7607. *Id*.
>
> Section 7607(b)(1) provides in turn for direct review of the Administrator's decision in the courts of appeals. See *Romoland*, 548 F.3d at 743. Section 7607(b)(2) further provides that "**[a]ction of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement**."

615 F.3d 1008, 1020 (5th Cir. 2010)(emphasis added). Thus, where a challenge could have been raised to a Title V permit during the permit process, no judicial review can thereafter be obtained through enforcement proceedings. In *Otter Tail*, the court made a distinction between claims that a permit is being violated, and a claim that the permit itself "omitted applicable CAA requirements." *Id*. Plaintiffs alleging claims that "amount[ing] to an allegation that the permit" is not in compliance with the CAA "could have been pressed during the permitting process'" and are barred. *Id*.

In *Otter Tail*, plaintiff Sierra Club brought a CAA enforcement action asserting that New Source Performance Standards ("NSPS") were triggered by a 2001 modification at the Big Stone site. The state agency approved a modification to the operating permit after expressly concluding that NSPS had not been triggered. EPA did not object, the Sierra Club did not request a hearing on the proposed permit, and the permit was thereafter modified. 615 F.3d at 1020. The court concluded

13

that EPA's decision not to object within 45 days triggered Sierra Club's right to petition for an objection, and that filing such a petition would have allowed Sierra Club to obtain review of the issue. *Id*. at 1021. Thus, since Sierra Club "could have" obtained review of whether NSPS had been triggered during the permitting process, district court review of the issue was barred by § 7607(b)(2).

Here, the claims made by TCE are quite similar to those that the Sierra Club made in *Otter Tail*, and share the common characteristic that review of the underlying issue of whether the CAA requirements should have been included in the Title V permit could have been obtained through administrative review. As was the case in *Otter Tail*, the state agency here made a specific determination with which plaintiffs disagreed. In *Otter Tail*, the decision was that NSPS had not been triggered—in this case TCEQ determined that prior permits 3010 and 9233 had been made obsolete, and the limitations set forth in those permits had been superceded by the Flexible Air Permit. Like *Otter Tail*, the EPA in this case made no objection to the Title V permit application which did not expressly include the prior permits as relevant sources of limitations. When EPA failed to object on the basis that the prior permits should have been included as sources of relevant limitations, TCE had the opportunity to petition for an objection, but failed to do so. Therefore, TCE missed its opportunity to obtain review during the administrative procedure, and this court lacks jurisdiction to address TCE's enforcement claims.

The logic of this result is "bolstered by the practicalities of the permitting process" because if plaintiffs were permitted to choose either to raise claims during the permitting process, or wait until later (sometimes *much* later) to file "an enforcement action," this could lead to "simultaneous suits by multiple parties raising the same or similar issues" thereby wasting judicial resources and hazarding inconsistent decisions. 615 F.3d at 1022. "In addition, to allow plaintiffs to raise issues resolved during the permitting process long after that process is complete would upset the reasonable

14

expectations of facility operators and undermine the significant investment of regulatory resources made by state permitting agencies." *Id*. In this case, LCRA expended huge sums of money to comply with state-approved permits which were uncontested by the EPA. Indeed, the statutory framework making resolution of permitting claims during the administrative process mandatory is a "sensible and efficient regulatory scheme." *Id*.

TCE makes the rather circular argument that it had no reason to object during the Title V permitting process to the lack of the express inclusion of the heat input and Unit 3 hourly particulate matter limitations because it believed that TCEQ's actions in voiding those limitations has no legal effect. Thus, TCE believes it had no need to object to the absence of those limitations because, in their view, those limitations survive regardless of whether they were included in the Title V permit, or can be "read into" the permit as a matter of law. As set forth above, however, decisions concerning the content of a Title V permit can be reviewed only as set forth in the statute, and as explained in *Otter Tail*, this divests district courts of jurisdiction over any claim that is the functional equivalent of a challenge to the appropriate provisions of a Title V permit that has been issued. Thus, TCE's need to raise the issue during the permitting process arises from its inability to raise it in a later enforcement suit.[1]

---

[1] TCE also asserts that this result gives LCRA the benefit of a "permit shield" that LCRA did not obtain with respect to whether requirements from Permit Nos. 3010 and 9233 survived the Flexible Air Permit. Briefly, an operator may use its Title V permit as a defense to a claim that CAA requirements apply, but only when "the permit includes the determination" that those specific requirements do not apply. § 7661c(f)(2). In this case, there is no mention in either the 2004 or 2009 operating permits of TCEQ's determination that Permit Nos. 3010 and 9233 are "obsolete." Thus, LCRA would not be entitled to a "permit shield" with respect to TCE's claims. This, however, does not change the court's analysis of its jurisdiction, as the Fifth Circuit explained in *Otter Tail*:

> Sierra Club may be correct that the district court's interpretation of §§ 7661d and 7607 restricts the permit shield's applicability, but this does not persuade us that its interpretation is erroneous. While § 7661c(f) is a statutory defense to liability,

The court lacks jurisdiction over any claim raised in this enforcement suit that could have been raised as an objection during the permitting process. Counts 1 and 4 are, therefore, DISMISSED in their entirety. Count 2 is DISMISSED IN PART, and to the extent that it is based upon an assertion that prior permit requirements were not voided by the 2002 Flexible Air Permit (Dkt. 14 ¶¶ 38-45).

**3.     Remainder of Count 2 - Rule 12(b)(6).**

The portion of Count 2 that is not barred by *Otter Tail* is contained in ¶¶ 46-49 of the First Amended Complaint, in which TCE alleges that between 2006 and 2009 FPP exceeded the Plantwide Applicability Limit ("PAL") for emissions set forth in the 2002 Flexible Air Permit and incorporated into the 2004 Operating Permit. Dkt. 14 ¶ 47. This exceedance is alleged to have triggered Prevention of Serious Deterioration or "PSD" requirements under the 2004 Operating Permit and required LCRA at the time of the exceedances to apply for a federal PSD permit and to comply with Best Available Control Technology ("BACT") requirements. *Id*. ¶¶ 48-49.

LCRA disagrees, and cites to the specific terms of the PAL, and the requirement that any exceedance be linked to either replacement or modification of existing facilities—which TCE has not alleged. The applicable provisions of the 2002 Flexible Air Permit read in relevant part:

SPECIAL CONDITION FOR REPLACEMENT AND MODIFIED FACILITIES

17.   A.   **Replacement Facilities** - This flexible permit authorizes permit holder to replace any facility covered in this flexible permit with a facility that functions in the same or similar manner so long as the replacement facility complies with all applicable permit conditions, the replacement facility emissions do not cause an exceedance ofthe

---

§ 7607(b)(2) limits district court subject matter jurisdiction. To the extent the two provisions are in tension, the jurisdictional limit is paramount.

615 F.3d at 1022.

> plantwide maximum allowable emission caps, and emissions are included in emission cap calculation and recordkeeping.
>
> B. **Modification of Facilities** - The flexible permit authorizes the permit holder to **modify any existing facility covered by the flexible permit or implement a change inconsistent with any representation of the flexible permit application** so long as such modification or change does not cause an exceedance of the plantwide maximum allowable emission caps, and emissions are included in emission cap calculation, and recordkeeping. Such authorization provided under this condition shall not apply to modifications involving removal of any existing air pollution control device unless it is replaced by a new control device achieving equivalent emissions control levels.

Dkt. 18-1 at 9 (bold emphasis added). This provision is then referenced in the PAL portion of the permit as follows:

> PLANTWIDE APPLICABILITY LIMIT (PAL)
>
> 18. Any project to be authorized pursuant to Special Condition No. 17A and B, permit by rule, or other TCEQ permitting mechanisms, including a permit amendment for the addition of new facilities, shall not be subject to federal new source review provided the total plantwide emissions do not exceed the PAL thresholds established by this permit for any air pollutant regulated by federal new source review . . . .
>
> **Only the changes that cause the new emission rates to exceed the PAL are subject to federal new source review**.

Dkt. 18-1 at 10-11 (bold emphasis added). Thus, as defined in the 2002 Flexible Air Permit, only "changes that cause the new emissions rates to exceed the PAL" are subject to PSD review, and "changes" are defined as either replacement of existing facilities, modification of an existing facility or "a change inconsistent with any representation of the flexible permit."

Indeed, as LCRA suggest, TCE does not plead either a "replacement" of existing facilities, or that existing facilities were "modified" thereby causing the alleged exceedances. Instead, TCE asserts that FPP operated at "heat input" levels beyond what was contained in prior, ostensibly

17

obsolete and voided permits, and that each time a heat input level was exceeded, this constituted a "change in the method of operation" sufficient to trigger PSD review. Dkt. 21 at 47. The applicable language from Paragraph 17 B, however, is that it applies to *modification* of existing facilities, which is not alleged, or "a change in operation inconsistent with any representation *of the flexible permit application*." Dkt. 18-1 at 9 (emphasis added). The court is not at all certain that a change in the heat input levels, which may be nothing more than increasing the hours of operation of a particular unit, would qualify as a modification of the method of operation of a facility generally. However, there is a more specific standard in the Flexible Air Permit—the change in operation must be inconsistent with a representation in the permit application, and TCE has simply not made any such allegation.

Therefore, the court finds that TCE has not alleged a PAL exceedance that would trigger PSD review under the express terms of the 2002 Flexible Air Permit. Thus, TCE has not alleged a plausible claim for relief, and the motion to dismiss the remaining portion of Count 2 is GRANTED. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547, 127 S.Ct. 1955 (2007) (complaint must state claim plausible on its face to survive Rule 12(b)(6) review).

4. **TCE's motion for partial summary judgment (Dkt. 31).**

TCE moves for partial summary judgment with respect to the issue of whether the hourly PM limit from Permit No. 9233 is still effective, and has been violated as alleged in Count 4. This court lacks jurisdiction to address Count 4, however, and the motion is DENIED in this respect.

TCE also seeks summary judgment with respect to Count 3, which survives the motion to dismiss. The court stayed discovery in this matter pending resolution of the motion to dismiss (Dkt. 41) and believes it best to await the completion of discovery before ruling on summary judgment. Thus, the motion is DENIED WITHOUT PREJUDICE as to Count 3.

## CONCLUSION

LCRA's and City of Austin's motions to dismiss (Dkts. 18 and 28) are GRANTED IN PART AND DENIED IN PART, leaving only Count 3 of the first amended complaint.

It is further ORDERED that TCE's motion for partial summary judgment (Dkt. 31) is DENIED as to Count 4, and DENIED as to Count 3 without prejudice to TCE's right to reassert its motion at the close of discovery.

It is further ORDERED that the stay of discovery entered in this case (Dkt. 41) is LIFTED, and the parties are directed to submit a joint proposed scheduling order within 14 days of the date of this order.

It is so ORDERED.

Signed at Houston, Texas on March 28, 2012.

_____
Gray H. Miller
United States District Judge